IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Charlotte Beck,                                    Case No. 3:10 CV 319

               Plaintiff,            MEMORANDUM OPINION
                                                   AND ORDER

      -vs-

                                   JUDGE JACK ZOUHARY

Buckeye Pipe Line Services Co.,

               Defendant.

### INTRODUCTION

Plaintiff Charlotte Beck ("Beck") initially filed this action in the Court of Common Pleas, Allen County, Ohio, alleging age and gender discrimination in violation of Ohio law. The case was later removed to this Court on the basis of diversity of citizenship jurisdiction.

Beck alleges her former employer, Defendant Buckeye Pipe Line Services, Co. ("Buckeye"), unlawfully terminated her employment following a reduction in force. Buckeye moved for summary judgment (Doc. No. 28-1) and Beck opposed (Doc. No. 30). This Court also held oral argument (Doc. No. 32).

### BACKGROUND

**Plaintiff's Employment**

Buckeye employs individuals who work on a nationwide pipeline network that supplies commercial end-users with refined petroleum products. From 1994 until her termination in July 2009, Beck worked at Buckeye's Lima, Ohio facility, most recently as a twelve-hour operator. By all accounts, Beck was a competent operator in terms of her technical skills.

In 2009, Buckeye reorganized its management structure and moved toward a less centralized organization, ostensibly to maintain competitiveness in the market. As often happens, this reorganization led to a nationwide reduction in force, ultimately costing nearly 150 employees their jobs.

To spearhead the reorganization, Buckeye's senior management appointed a "Design Team," consisting of ten company leaders -- both male and female, and including those protected by the Age Discrimination in Employment Act ("ADEA") -- to design a new organizational structure. This resulted in some jobs being eliminated or reclassified. Once the Design Team settled on a new model, it had the unenviable task of evaluating those employees who would be retained to fill the new structure (Doc. No. 28-4, at 1–4).

**The Evaluation Process**

The Design Team developed an evaluation process to assess the skills of individual employees, applying criteria to evaluate an employee's "qualitative skills," known as the "B" score, and "technical skills," known as the "A" score (Doc. No. 28-2, at 2). The "A" score measured the "technical ability or the physical ability to perform a particular task," whereas the "B" score considered whether an employee would fit in with Buckeye's "new culture" (Doc. No. 28-21, at 73). Specifically, the "B" score looked at the attitudes and behaviors of employees in terms of "being accountable for [their] actions, taking initiative, being a team player, having an entrepreneurial outlook" (*id.* at 74).

Employees who blamed others, complained unnecessarily, and were overly critical received lower "B" scores, whereas employees who were "team players," proactive, and accountable received higher "B" scores (Doc. No. 28-4, at 4). For each "A" and "B" score, the range varied from 0 (the

2

lowest) to 4 (the best) (*id*.). Each "A" score was worth 10 points and each "B" score was worth 15, for a total possible score of 100. An employee who received a 0 or 1 for the "B" score would mathematically fail to reach 60 points, the threshold for retention, regardless of the "A" score (Doc. 28-21, at 81–82).

The Design Team required at least two people, with actual knowledge of the respective employee, to evaluate the particular employee and cite examples of conduct supporting the proposed score (Doc. No. 28-4, at 4). If two members of the Design Team did not have personal knowledge of the employee being evaluated, the Design Team called on other employees who possessed such personal knowledge to assist in the assessment (*id.* at 5). A consensus among all evaluators on a score was required before that score was entered as final (*id.* at 5–6).

**Plaintiff's Evaluation and Termination**

When it came time to evaluate non-managerial employees at the Lima facility, the Design Team determined it did not have the requisite number of members with personal knowledge of each employee's work performance, including Beck. Therefore, the Design Team enlisted the help of individuals with such knowledge to help evaluate the Lima employees. Carl Ostach presided over a small group, including Rick Bishop, Roger Hatch, Mark Johnson, and Bill Serra, that evaluated Beck and other Lima employees (Doc. Nos. 28-6, at 5; 28-3, at 3; 28-2, at 4).

Johnson and Bishop provided primary input on Beck's work performance, as they seemed to have the most contact with her (Doc. Nos. 28-2, at 4; 28-6, at 5–6). Although Beck was considered a competent operator technically, she did not receive high marks for -- to borrow a sports reference -- the "intangibles." The group believed Beck was not a "team player;" resisted filling in for other operators when they were sick or on vacation; was uncooperative and slow to respond to Buckeye's

3

Control Center; lacked accountability; and was only willing to perform the minimum requirements of her job (Doc. No. 28-2, at 5; 28-3, at 3; 28-6, at 5–6).

Based on the group's discussions, Beck received a total score of 35, receiving 1 point for her "B" score and 2 points for her "A" score (Doc. No. 28-2, at 5). This score fell well below the threshold score of 60, and Beck was therefore terminated on July 20, 2009, along with 140 other employees nationally (Doc. No. 28-4, at 6). At the time of her termination, Beck was fifty years old and the only female operator at the Lima facility.

### DISCUSSION

**Standard of Review**

Federal Civil Rule 56(c) states summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, it determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

**Age and Gender Discrimination Claims**

Beck asserts claims for both age and gender discrimination under Ohio Revised Code §§ 4112.02 and 4112.99. Like federal discrimination claims, Beck's claims are subject to the *McDonnell-Douglas* burden-shifting framework. *See Weller v. Titanium Metals* Corp., 361 F. Supp. 2d 712, 716 (S.D. Ohio 2005). That framework requires Beck to first set forth a *prima facie* case of

4

discrimination; the burden then shifts to Buckeye to offer a legitimate, non-discriminatory reason for Beck's discharge; and finally, the burden shifts back to Beck to show that Buckeye's reason is pretextual. *Id.*

Here, Buckeye concedes, for purposes of its Motion, that Beck can demonstrate a *prima facie* case of discrimination (Hr'g Tr. at 3). Likewise, Beck concedes Buckeye has articulated a legitimate, non-discriminatory reason for her termination -- a reduction in force (Doc. No. 30, at 14).

That leaves this Court to decide whether Beck has set forth sufficient evidence demonstrating Buckeye's proffered reason for her termination is simply pretext. *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). Beck can establish pretext by putting forth evidence showing that (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate her discharge, or (3) they were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

**Pretext**

Here, Beck relies solely on the second method of establishing pretext, claiming Buckeye's proffered reason -- the reduction in force -- was not the actual motivation for the discharge (Doc. No. 30, at 13–21; Hr'g Tr. at 4). Under this method, Beck can show pretext by demonstrating the "sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that [Buckeye's] explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. The mere possibility of a factual dispute, however, is not enough to overcome summary judgment. *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986).

To this point, Beck makes several interrelated arguments. First, she contends Buckeye used only subjective criteria in evaluating her work performance, making her evaluation a pretext for

5

discrimination.  Second, Beck contends that members of the Design Team did not follow their own subjective criteria standards because the team members who provided the primary input about Beck, Bishop and Johnson, did not have actual knowledge of her work performance.  Finally, Beck argues Bishop disregarded information he received from Kevin Dansby, Beck's direct supervisor.

There is no dispute that part of Buckeye's evaluation process, for all employees, involved a subjective component.  Despite Beck's suggestions otherwise, the use of subjective criteria alone is not indicative of pretext.  For example, the court in *Brown v. EG&G Mound Applied Technologies, Inc.* considered, and rejected, a similar argument. 117 F. Supp. 2d 671, 680 (S.D. Ohio 2000).  There, the court stated: "Plaintiff faults the employee matrix used by Defendant as 'subjective', however, she offers no evidence indicating that this subjectivity was used as a pretext for discrimination. The fact that individual managers had flexibility in determining individual components of a matrix score, does not indicate discrimination."  *Id.*; *see also Hillery v. Fifth Third Bank*, 2010 U.S. Dist. LEXIS 48159, at \*32 (S.D. Ohio 2010) ("The lack of an organized plan is therefore only one factor that may lead to a finding of pretext, not a dispositive factor as Plaintiff suggests.").

This Court agrees that the use of subjective criteria, in and of itself, does not demonstrate Buckeye's given reason for terminating Beck was pretextual. Beck puts forth no evidence showing the evaluation process was applied to her in a discriminatory manner or that it was used as a pretext for her termination.  Indeed, Beck concedes there is no direct evidence that the Design Team applied the evaluation criteria to Beck in a discriminatory way (Hr'g Tr. at 19).

Beck instead relies on alleged circumstantial evidence of discrimination.  Beck argues that even if Buckeye could permissibly use subjective criteria, the Design Team did not follow its own

procedures as neither Bishop nor Johnson had actual knowledge of Beck's work performance, and Bishop failed to take into account Dansby's comments about Beck.

The record reveals, however, that Bishop and Johnson each had personal knowledge of Beck's work performance. Bishop worked as Buckeye's Project Manager/Project Engineer for the Lima territory where Beck worked (Doc. No. 28-6, at 1). In that capacity, Bishop worked with Beck and other pipeline operators (*id.*). Bishop was later promoted to District Manager, where he indirectly supervised Beck (*id.* at 2). Johnson previously "worked with Ms. Beck for quite a few years in [his] capacity as the Control Center Shift Supervisor and, prior to that, as a Pipeline Controller" (Doc. No. 28-3, at 3). Even Beck's testimony, while downplaying her interaction with Johnson, conceded she "might have worked" with him (Doc. No. 28-12, at 53). While Beck cannot specifically recall working with Johnson, this does not mean the two did not work together or that Johnson was not well-aware of Beck's work performance.

Beck's primary argument is that the Design Team -- and specifically Bishop -- disregarded its own evaluation procedures by seeking and then ignoring Dansby's opinion of Beck (Doc. No. 29-1, at 105–06, 127–28, 135). Clearly Dansby's opinion (that Beck was a good employee and should be retained) differed from the Design Team's evaluation. There are two problems with this argument.

First, although Dansby gave several specific instances of Beck's work performance that contradict her evaluation, Dansby did not provide these examples to Bishop **prior** to the Design Team meeting. When Bishop contacted Dansby for input, the **only** input Dansby provided was that he believed Beck, along with all other operators, were "good workers" (Doc. No. 29-1, at 105–106, 107). When Bishop asked Dansby which employees he would "phase out," if required, Dansby responded

7

"none of them" (*id.*).  It was not until deposed in this lawsuit that Dansby offered his differing opinions.

To show pretext, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Company*, 258 F.3d 488, 494 (6th Cir. 2001).  But the Design Team did not ignore or disregard Dansby's input.  His opinion of Beck back then was neutral, and changed to more positive when deposed.

Second, even if Dansby had articulated reasons for boosting Beck's "B" score, that would be of no moment because a plaintiff cannot "show pretext by his previous good evaluations or the good opinions of co-workers or previous supervisors." *Weller*, 361 F. Supp. 2d at 722.  Although Beck may well be correct that because Dansby was her direct supervisor, he had a sound, if not solid basis for evaluating her, that does not mean the team evaluation she received was discriminatory.  "Generally, the soundness of an employer's decision to discharge based on evaluation of job performance may not be questioned as a means of showing pretext." *Id.* (citing *Brocklehurst v. PPG Industries Inc.*, 123 F.3d 890, 898 (6th Cir. 1997)).

Dansby's opinion at the time, or later, simply does not call into question the veracity of the team opinion. As the Sixth Circuit has remarked: "[i]t is simply stating the obvious to observe that what may have satisfied one management regime does not necessarily satisfy its successor, and Plaintiff's proffered evidence does not serve to rebut [Buckeye's] current management's views regarding [Beck's] insufficient skills . . . ." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 474 (6th Cir. 2002).  In short, because Dansby was not part of the Design Team, his belated opinion of each employee's work performance does not create a disputed fact or pretext.

8

Finally, it is worth noting that Beck cannot show pretext with respect to her age discrimination claim -- which even Beck admits is weak (Hr'g Tr. at 22) -- for an additional reason: none of the team members knew Beck's age (Doc. Nos. 28-2, at 6; 28-3, at 3–4; 28-5, at 4; 28-6, at 7).  Beck cites to nothing in the record to rebut this salient point.

## CONCLUSION

This Court is sympathetic to the job reductions that have spread throughout Northwestern Ohio in recent years.  However, this case seems to represent a sincere effort by an employer to make difficult decisions on which employees to retain within the appropriate legal boundaries.  For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 28-1) is granted.

IT IS SO ORDERED.

        *s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

May 25, 2011